1  SCOTT A. EDELMAN, SBN 116927
      sedelman@gibsondunn.com
2  GIBSON, DUNN & CRUTCHER LLP
   2029 Century Park East
3  Suite 4000
   Los Angeles, CA  90067-3026
4  Telephone:  310.552.8500
   Facsimile:   310.551.8741
5
   THEODORE J. BOUTROUS, JR., SBN 132099
6     tboutrous@gibsondunn.com
   PERLETTE MICHELE JURA, SBN 242332
7     pjura@gibsondunn.com
   JEREMY S. SMITH, SBN 283812
8     jssmith@gibsondunn.com
   GIBSON, DUNN & CRUTCHER LLP
9  333 South Grand Avenue
   Los Angeles, CA  90071-3197
10 Telephone:  213.229.7000
   Facsimile:   213.229.7520
11
   Attorneys for Churchill Downs Technology
12 Initiatives Company

13

14              UNITED STATES DISTRICT COURT
15             CENTRAL DISTRICT OF CALIFORNIA
                   WESTERN DIVISION
16

17 Churchill Downs Technology Initiatives      CASE NO. 2:21-CV-00986
   Company,
18                                             **COMPLAINT FOR DECLARATORY
                      Plaintiff,               AND INJUNCTIVE RELIEF**
19
            v.                                 **REDACTED VERSION OF
20                                             DOCUMENT PROPOSED TO BE
   Thoroughbred Owners of California,          FILED UNDER SEAL**
21
                      Defendant.
22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

_____

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Churchill Downs Technology Initiatives Company ("Churchill Downs Technology") files this Complaint for declaratory and injunctive relief and alleges:

## INTRODUCTION

1.      Churchill Downs Technology is a wholly-owned subsidiary of Churchill Downs Incorporated, a leader in the horse racing industry.  Churchill Downs Technology has provided online and telephonic wagering services to California residents for more than a decade.  Churchill Downs Technology's future in California, and the funding it generates within and for the State of California, is now threatened.

2.      In December 2020, Churchill Downs Technology entered into a contract with Los Angeles Turf Club, Incorporated d/b/a Santa Anita Park ("Santa Anita Park"), providing Churchill Downs Technology the right to accept online wagers from California residents and collect a fee of ▮% for all bets placed on its website, www.TwinSpires.com, and ▮% for all bets placed on its other website, www.BetAmerica.com.

3.      Defendant Thoroughbred Owners of California ("TOC") is *not* a party to that agreement.  However, TOC is unhappy with the deal struck by Churchill Downs Technology and Santa Anita Park because it believes that thoroughbred owners should receive *more* money even though these rates have been in place for almost a decade and California's horseracing industry already retains a large majority of the revenue generated from online wagers.

4.      Dissatisfied with getting the lion's share of revenue, TOC is attempting to utilize a statute—California Business & Professions Code section 19604—to force Churchill Downs Technology into binding arbitration.  Specifically, TOC is demanding that an arbitrator rule that Churchill Downs Technology is only entitled to 4.1%—not the amounts (▮% and ▮%) that Santa Anita *contracted for* Churchill Downs Technology to receive from wagers placed by California residents.  This change would cost Churchill Downs Technology millions of dollars and upset almost a decade of an established course of dealing between the contracting parties.  While the

difference in percentages may at first seem insignificant, they are worth millions of dollars. That is because the vast majority (approximately 80%) of the wagered dollars must go back to the public. So any reduction in the percentages, even just a tenth of a percentage, has a significant impact on Churchill Downs Technology's ability to operate in California.

5. As far as Churchill Downs Technology is aware, arbitration under this statute has never been invoked, and it cannot be invoked in this way against Churchill Downs Technology without violating the United States and California Constitutions:

6. *First*, Section 19604 provides **no standard** whatsoever for how the arbitrator determines whether to honor the percentage that Santa Anita Park and Churchill Downs Technology contractually agreed to. All it says is that the arbitrator is "required to choose between" the amount in the contract and the amount demanded by the horsemen's association (here TOC). There is **nothing** in the statute to tell the arbitrator how to make that choice. This violates the Due Process Clauses of the United States and California Constitutions.

7. *Second*, Section 19604 lacks the procedural protections necessary to ensure Churchill Downs Technology's constitutional rights are not violated. The statute provides **no right to judicial review and requires the process be completed in just 60 days**. The statute requires that the "arbitration shall be held as promptly as possible, but in no event more than 60 days following the demand for that arbitration" and it makes the arbitrator's rushed and standard-less decision "final and binding on the parties."

8. Moreover, Churchill Downs Technology **never agreed** to this arbitration scheme; it has been unilaterally imposed by statute which forces Churchill Downs Technology to choose between three fundamentally unfair options: accepting the lower rate proposed by TOC, abandoning its hub agreement with Santa Anita Park, or proceeding to arbitration. In other words, Churchill Downs Technology has to abandon the millions of dollars it invested in its business in California and the rights it

1   has under contract, or it has to proceed to a standard-less but binding arbitration.  This

2   violates the Due Process Clauses of the United States and California Constitutions.

3      9. *Third*, Section 19604 allows a **third party** to use its provisions to disrupt

4   and deprive Churchill Downs Technology of the benefit of its bargain under its

5   contract with Santa Anita Park.  Again, the statute forces two contracting parties into

6   one of three untenable options:  accept the lower rate proposed by a stranger to the

7   contract, abandon their hub agreement based on the demand of a stranger to the

8   contract, or proceed to binding arbitration with a stranger to the contract.  This violates

9   the Due Process **and** Contract Clauses of the Unites States and California

10  Constitutions.

11     10. For each of these reasons, individually and collectively, Churchill Downs

12  Technology asks this Court to declare that TOC's invocation of California Business

13  and Professions Code section 19604 is invalid and unenforceable against Churchill

14  Downs Technology, including the provisions requiring that Churchill Downs

15  Technology accept a lower hub fee rate as proposed by TOC, abandon its hub

16  agreement with Santa Anita Park, or proceed to arbitration, as well as injunctive relief

17  prohibiting TOC's invocation of Section 19604.

18  **JURISDICTION AND VENUE**

19     11. This case raises questions under the Constitution of the United States and

20  thus this Court has jurisdiction over all claims for relief pursuant to 28 U.S.C. § 1331.

21  Additionally, the parties are completely diverse from one another and the amount in

22  controversy exceeds $75,000 and thus the court has jurisdiction over all claims under

23  28 U.S.C. § 1332.

24     12. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202, as well as

25  Federal Rule of Civil Procedure 57.

26     13. Injunctive relief is authorized under Federal Rule of Civil Procedure 65.

27     14. Venue is proper in this district under 28 U.S.C. § 1391(b).

28

Gibson, Dunn &
Crutcher LLP

15.     An actual controversy exists between the parties concerning Section 19604's arbitration provisions.  A declaration that TOC's invocation of California Business and Professions Code section 19604 is invalid and unenforceable against Churchill Downs Technology, including the provisions requiring that Churchill Downs Technology accept a lower hub fee rate as proposed by TOC, abandon its hub agreement with Santa Anita Park, or proceed to arbitration, as well as injunctive relief prohibiting TOC's invocation of Section 19604 would resolve the controversy.

## NATURE OF DISPUTE & GOVERNING CONSTITUTIONAL PRINCIPLES

16.     This action seeks declaratory and injunctive relief prohibiting TOC from invoking Section 19604 to force Churchill Downs Technology to accept a lower hub fee rate, abandon its hub agreement with Santa Anita Park, or proceed to binding arbitration pursuant to Section 19604.  Section 19604 deprives Plaintiff Churchill Downs Technology of its due process rights under both the United States and California Constitutions and substantially impairs its right to contract in violation of the Contracts Clauses of the United States and California Constitutions.

17.     Under both the Due Process Clause of the United States Constitution and the Due Process Clause of the California Constitution, the states shall not "deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1; Cal. Const. art. I, § 7.  The California Constitution provides even greater protections than the federal constitution with respect to deprivation of life, liberty, or property.  *See People v. Ramirez*, 25 Cal. 3d 260, 267-68 (1979); *People v. Bedrossian*, 20 Cal. App. 5th 1070, 1074 (2018).  "[T]he prohibition against the deprivation of property without due process of law reflects the high value, embedded in our constitutional and political history, that we place on a person's right to enjoy what is his, free of governmental interference." *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972)

18.     Additionally, both the United States and California Due Process Clauses require that laws "provide explicit standards for those who apply them.  A vague law impermissibly delegates basic policy matters . . . for resolution on an ad hoc and

subjective basis with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108-109 (1972); *see also Tobe v. City of Santa Ana*, 9 Cal. 4th 1069, 1106-07 (1995). "[A] statute which either forbids or requires the doing of an act in terms so vague that [people] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926).

19.   Moreover, the Contracts Clauses of the California and United States Constitutions protect the right to contract by declaring that no state may pass a law "impairing the Obligation of Contracts." U.S. Const., art. I, § 10; Cal. Const, art I, § 9. The Contracts Clauses prohibit the government from passing laws that substantially impair a private contractual relationship in the absence of a significant and legitimate public purpose. *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983); *see also Alameda Cty. Deputy Sherif's Ass'n v. Alameda Cty. Employees' Ret. Ass'n*, 9 Cal. 5th 1032, 1074-75 (2020).

## THE PARTIES

20.   Plaintiff Churchill Downs Technology's parent company, Churchill Downs Incorporated, is a leader in the horseracing industry and the owner of a number of racetracks in multiple states, including the world-famous Churchill Downs Racetrack in Louisville, Kentucky that hosts the iconic Kentucky Derby. Churchill Downs Technology has two websites, TwinSpires.com and BetAmerica.com, which provide California residents with access to horse races all over the country and the world.

21.   Churchill Downs Technology is incorporated in Delaware and has its principal place of business in Kentucky.

22.   Defendant TOC is a horsemen's organization that represents thoroughbred owners in California. TOC is incorporated in California and has its principal place of business in Arcadia, California.

# FACTS

## Horse Racing in California

23.     Every year, billions of dollars are wagered by horseracing fans, all throughout the country, on races both inside and outside of California.  The sport is one proudly entrenched in California's history and authorized by the State's Constitution.  Cal. Const. art. IV. § 19.

24.     With the advent of enabling technology, and facing difficulties sustaining racing within the State, the California legislature enacted AB 471 in 2002.  The bill, which became Section 19604, authorized for the first time online and telephonic wagering on horse races, so that California residents could place wagers on horse races occurring anywhere in the country.

25.     For example, a resident in California can safely and legally place a bet on a horse running in the Kentucky Derby by utilizing the website www.TwinSpires.com.

26.     Online and telephonic wagering, known as advanced deposit wagering ("ADW"), has transformed horse racing in the State, and allowed the many stakeholders involved in horse racing to continue to prosper.  This has been particularly true since the beginning of the COVID-19 pandemic, which led to limited races and limited spectators for months.

27.     ADW providers, such as TwinSpires and BetAmerica, make significant investments in technology, marketing, and customer service to bring horse racing to as many fans possible, attract new fans, and make wagering on horses fun and easy.

28.     During the COVID-19 pandemic, the ADW distribution not only kept fans engaged when they could not otherwise go to a race track, but also attracted and created many new fans of horseracing.

29.     Rather than appreciating this necessary and growing distribution outlet, TOC has treated the ADW providers as competition, not as valued partners.  This is bad for horse racing fans and horseracing as a whole.

## The Economics of Horse Racing and the Statutory Scheme

30.　The vast bulk of every wager placed on horse racing in California—approximately four out of every five dollars—is returned to customers who place the winning bets.  With approximately 80% returned to racing fans, that leaves approximately 20% for the horseracing industry to compensate the track conducting the races, the horsemen (horse owners, trainers, jockeys, etc.) racing, and the wagering outlet accepting the wagers and servicing the customers.

31.　TOC offers the following graphic on its website to illustrate how wagered dollars are divided up in California:[1]



32.　The percentage of wagering that an ADW provider licensed in California receives from wagers placed by California residents on out-of-state races is determined by an agreement known as a "hub agreement."  Pursuant to Section 19604, a hub agreement is the written agreement providing for contractual compensation (a.k.a., the "hub fee") to ADW providers for wagers placed by California residents on races

---

[1]  Thoroughbred Owners of California, *Who Gets What: Where the Wagering Dollar Goes* (2016), https://www.toconline.com/wp/wp-content/uploads/2016/02/WhoGetsWhatSingles.pdf (last visited Feb. 2, 2021 12:45 PM).

conducted outside of California.  Cal. Bus. & Prof. Code § 19604(a)(7).  By statute, the hub fee may not exceed 6.5% of the handle, or amount wagered.  *Id.* § 19604(a)(5).

33.    Since approximately 80% must go back to the customers placing winning bets and the ADW providers cannot retain more than 6.5% of the wagers by California law, that leaves at least 13.5% for other stakeholders, including racetracks, the horsemen running the races, and horsemen organizations.  *See* Cal. Bus & Prof. Code § 19604(a)(5), (f).

34.    Horsemen's organizations are recognized by the California Horse Racing Board as responsible for negotiating the amount paid to the owners of racing horses for participating in a given race, known as "purses."  Cal. Bus. & Prof. Code § 19604(a)(6).  (TOC is a horsemen's organization.)

35.    Racing associations and fairs are the organizations responsible for conducting live horse races in California.  (Santa Anita Park is a California racing association.)

36.    Under Section 19604, an ADW provider, such as Churchill Downs Technology, can choose to enter into a hub agreement with an organization that conducts live horse races in California—that is, a racing association or fair—or a horsemen's organization, or both.  *See* Cal. Bus. & Prof. Code § 19604(b)(2)(B).  For a racing association or fair to be eligible to enter into a hub agreement with an ADW provider, the racing association or fair must conduct at least five weeks of live horse races on the breed of horse.  *Id.* § 19604(b)(2)(B).

37.    If an ADW provider chooses to enter a hub agreement with only a racing association (or fair), Section 19604 requires the signatories to provide a copy of the hub agreement to the horsemen's organization within five days.  Cal. Bus. & Prof. Code § 19604(b)(2)(D).

## Section 19604's Arbitration Scheme

38.    If the horsemen's organization dislikes the signatories' contractually agreed-upon hub fee, the statute provides that the horsemen's organization may issue a

written demand for arbitration and propose an alternate fee within ten days of receipt of the hub agreement. Cal. Bus. & Prof. Code § 19604(b)(2)(D). According to the statute, the ADW provider has only three untenable choices if a horsemen organization complains: (1) abandon the hub agreement altogether; (2) accept the horsemen's organization's alternate fee; or (3) proceed to arbitration under the statute. *Id.*

39.     If the ADW provider wants to preserve its contract, then its only option is to proceed to arbitration. Section 19604 requires that the arbitration must be held within 60 days of the horsemen's organization's demand for arbitration. Cal. Bus & Prof. Code § 19604(a)(8)(C). The statute further provides that the arbitration must be administered by the Judicial Arbitration and Mediation Services ("JAMS") pursuant to its Streamlined Arbitration Rules and Procedures. *Id.*

40.     Section 19604 further dictates that "the arbitrator shall be required to choose between the contractual compensation of the hub agreement agreed to by the ADW provider or whatever different terms for the hub agreement were proposed by the party requesting the hub agreement arbitration." Cal. Bus & Prof. Code § 19604(a)(8)(C). But it does not provide any standard for how the arbitrator chooses between the contractual compensation specified in the disputed hub agreement and the alternate fee proposed by the horsemen's organization. *See id.*

41.     Section 19604 mandates that any arbitrator's decision is "final and binding" on the parties and provides for no right of meaningful judicial review. Cal. Bus & Prof. Code § 19604(a)(8)(C). While the statute expressly provides the right "to bring an action in state court . . . to enforce the decision of the arbitrator," it fails to provide any mechanism for Churchill Downs Technology or TOC to seek judicial review. *See id.* There is not even a mechanism to move to vacate an arbitration award that is arbitrary, capricious, or procured by fraud. *See id.*

42.     Other California statutory arbitration schemes explicitly provide for an appeals process or other mechanism for judicial review of an arbitration award. For example, Section 25000.2 of the California Business and Professions Code requires

that beer distributors undergo a mandatory arbitration process if there is a dispute over the fair market value of beer distribution rights. Cal. Bus. & Prof. Code § 25000.2(f). The statute provides that the "decision of the arbitrator shall be final and binding on the parties *unless notice of appeal is filed within 10 business days after service of the arbitration award*[.]" *Id.* § 25000.2(f)(5) (emphasis added). Further, "[u]pon filing of the appeal, the court *shall review the arbitration award for errors of fact or law by determining whether the award is supported by the sufficiency of the evidence* presented at the arbitration." *Id.* (emphasis added). Section 19604 contains no such safeguards.

43. Several other California statutes also provide for judicial review of an arbitration award made pursuant to statute. For example, California law requires arbitration of certain civil disputes where the amount in controversy does not exceed $50,000. Cal. Civ. Proc. Code § 1141.11(a). That arbitration scheme provides that "[a]n arbitration award shall be final *unless a request for a de novo trial or a request of dismissal in the form required by the Judicial Council* is filed within 60 days after the date the arbitrator files the award with the court." *Id.* (emphasis added). Further, the statute provides that "[a]ny party may elect to have a de novo trial, by court or jury, both as to law and facts." *Id.* § 1141.20(b). Similarly, the statutory arbitration scheme relating to disputes over garment manufacturing provides that "[w]ithin 10 days of receipt of notice of the award, the party or parties who are required to comply with the terms of the award shall so comply and file proof of such compliance with the commissioner *or shall file a notice of appeal with the superior court*[.]" Cal. Lab. Code § 2691 (emphasis added). Section 19604 has nothing similar.

44. Further, Section 19604 does not even incorporate the protections afforded to arbitration awards made under the California Arbitration Act ("CAA"), such as the ability to move to vacate the award on grounds of fraud. *See* Cal. Bus. & Prof. Code § 19604. The CAA provides that an arbitration award may be vacated if, (1) "[t]he award was procured by corruption, fraud or other undue means; (2) [t]here was

Gibson, Dunn & Crutcher LLP

11

corruption in any of the arbitrators; (3) [t]he rights of the party were substantially prejudiced by misconduct of a neutral arbitrator; [or] (4) [t]he arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted." Cal. Civ. Proc. Code § 1286.2(a)(1)-(4). Other California mandatory arbitration schemes explicitly incorporate protections under the CAA, *see*, *e.g.*, Cal. Bus. & Prof. Code § 25000.2(f)(5), but not Section 19604.

45.    California courts have recognized the importance of these judicial safeguards in the context of statutory arbitration schemes. *See Bayscene Resident Negotiators v. Bayscene Mobilehome Park*, 15 Cal. App. 4th 119, 133-34 (1993) ("The Legislature's failure to impose binding arbitration on nonconsenting parties evidences a valid concern for preserving a parties right to due process through access to the courts.").

**TOC Tries to Shakedown Churchill Downs Technology & Demands Arbitration**

46.    On October 28, 2020, TOC Chief Executive Officer, Greg Avioli asked Mike Ziegler, Churchill Downs Incorporated's then Executive Director of Racing, to "voluntarily return the equivalent of 1% of the total" amounts generated from California residents wagering on Churchill Downs Technology's platforms in 2020. In addition, Mr. Avioli proposed that all ADW providers agree to a 3.0% hub fee for the 2021-2022 term—a rate Churchill Downs Technology has never agreed to in its history of operating in California. Indeed, at such a rate, Churchill Downs Technology would be operating at a significant loss, and it would make little sense to do business in California or with California residents. TOC threatened that if Churchill Downs Technology did not comply with its "voluntary" request, it would demand arbitration pursuant to Section 19604.

47.    Contrary to Mr. Avioli's false characterization, the revenue ADW providers earned in 2020 was not a "windfall," but the result of increased demand for online wagering. There is simply no basis for TOC to earn more money when

California's horse-racing industry already retains a large majority of the revenue generated from online wagers. TOC has not contributed a single cent or ounce of effort in 2020 to the efforts and success of www.TwinSpires.com and www.BetAmerica.com, and has no right to a greater portion of their revenue.

48.     Although TOC wishes to confuse the issue to make it appear more sympathetic, California law already ensures that TOC is handsomely compensated any time a wager is placed on races occurring *inside* or *outside* of California. Indeed, Section 19604 ensures the California horse racing industry, including TOC, receives the majority of the money available, after winning bets are paid out, earned from a race, and that the California horsemen and horsemen organizations do far better than their colleagues in every other state or nearly every other state.

49.     When an ADW accepts wagers from California residents on an out-of-state race, the track hosting that race, which is not in California, also collects a "host fee" as compensation for conducting it. California law caps the host fee amount at just 3.5%, in addition to capping the hub fee rate. Cal. Bus. & Prof. Code § 19604(a)(5)(A)-(B). By capping the out-of-state track's host fee and the ADW provider's hub fee, Section 19604 ensures that California's horsemen groups and racing associations receive the vast bulk of revenue earned from wagers placed by California residents, *regardless* of where the race actually takes place. In this way, Section 19604 allows the California horse racing industry to collect the majority of revenue from California residents' wagers, even when other states' horse racing industries have done all of the work to conduct the race and facilitate the wagering in the first place.

50.     Given the false premises in TOC's letter, the handsome compensation already provided to the California horse racing industry, TOC's unreasonable demands, and the additional value provided by ADW providers, Churchill Downs Technology did not agree to TOC's demand for a 1% "return" of money it was never

entitled to, nor its demand that Churchill Downs Technology accept a substantially lower hub fee in 2021.

51.     Instead, Santa Anita Park and Churchill Downs Technology negotiated and agreed to a hub agreement for 2021 (the "Hub Agreement"), which set the hub fees to be paid for wagers placed by California residents on out-of-state races through Twinspires.com and BetAmerica in 2021.  Recognizing the enormous value that Churchill Downs Technology brings by operating and marketing its popular websites, Santa Anita Park agreed that Churchill Downs Technology should receive a fee of ▇% for all bets placed on its website, www.TwinSpires.com, and ▇% for all bets placed on its other website, www.BetAmerica.com.  These rates were far below the statutory maximum of 6.5%.  Cal. Bus & Prof. Code § 19604(a)(5)(A).  A copy of the executed agreement, dated December 22, 2020, is attached as Exhibit A ("2021 Churchill Downs Technology Initiatives Company and Santa Anita Park Executed Hub Agreement").

52.     After Churchill Downs Technology reached its agreements with Santa Anita Park as to its 2021 hub fees, Churchill Downs Technology provided a copy of the Hub Agreement to TOC, as required under Section 19604.  Cal. Bus. & Prof. Code § 19604(b)(2)(D).

53.     Despite the fact that rates agreed to by Churchill Downs Technology and Santa Anita Park were significantly below the statutory maximum—▇% and ▇% *less* respectively— and on par with the historical rates for Churchill Downs Technology, TOC remained determined to lower it further.  The same day that TOC received a copy of the hub agreement, Mr. Avioli demanded that Churchill Downs Technology voluntarily return approximately 0.9% of its 2020 handle, equal to $1.23 million, and reiterated TOC's intent to use Section 19604's arbitration provisions to set a hub fee rate of 4.1% or lower.

54.     Churchill Downs Technology refused.  Agreeing to such a proposal would jeopardize the continued operation of Churchill Downs Technology's business in

California and establish a dangerous precedent that will continue to unfairly hurt out-of-state interests.

55. On December 31, 2020, TOC sent two letters to Churchill Downs Technology, one for Twinspires.com and the other for BetAmerica. The letters demanded that Churchill Downs Technology pick one of three options: (1) abandon its hub agreement with Santa Anita Park; (2) accept an alternate hub fee of 4.1%; or (3) proceed with a hub agreement arbitration. Copies of these letters are attached as Exhibit B ("TOC Demand for Hub Agreement Arbitration – Bet America") and Exhibit C ("TOC Demand for Hub Agreement Arbitration – Twinspires").

56. On January 13, 2021, TOC filed a demand for arbitration with JAMS, purporting to officially start the 60-day clock on a rushed arbitration process. Cal. Bus. & Prof Code § 19604(a)(8)(C); *see* Judicial Arbitration and Mediation Services, *Streamlined Arbitration Rules and Procedures*, Rule 5 (Commencing an Arbitration and Service), https://www.jamsadr.com/rules-streamlined-arbitration/. A copy of the JAMS Demand for Arbitration is attached as Exhibit D. JAMS Streamlined Arbitration Rules and Procedures is attached as Exhibit E.[2]

57. Under Section 19604, Churchill Downs Technology now faces nothing but untenable options. It could abandon the hub agreement, meaning all of its investment in building and promoting its websites in California will be lost. It could accept TOC's unreasonable and unsustainable hub fee, which would effectively cause the same result since it is highly questionable that Churchill Downs Technology can profitably operate at 4.1%. Or it could go to a binding, unconscionable arbitration process, which would deprive Churchill Downs Technology of its right to access the courts, force it into a rushed process without any standards guiding the arbitrator's decision, and allow a third-party to use California law to upend its contractual rights

---

[2] Additionally, TOC has already threatened to attempt to use these arbitration provisions in future years. This sets the stage for a continuous, protracted, and inefficient legal dispute between TOC and Churchill Downs Technology.

Gibson, Dunn & Crutcher LLP

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

with Santa Anita Park.  Lacking clarity, and recognizing that none of "options"
provided by Section 19604 were actually fair or viable choices, Churchill Downs
Technology was forced to bring this lawsuit, seeking a declaration that TOC cannot
force it to proceed to a fundamentally unfair and unconstitutional scheme and
enjoining the organization from utilizing Section 19604 to force Churchill Downs
Technology to choose between abandoning its agreement, submitting to TOC's
proposed rate, or arbitrating.

<h3 align="center">COUNT I</h3>

**Declaratory and Injunctive Relief: The Arbitration Provisions of Section 19604 are Invalid and Unenforceable against Churchill Downs Technology and it Cannot be Compelled to Arbitrate**

58.    Plaintiffs incorporate here by reference paragraphs 1 through 57, as if fully set forth herein.

59.    Section 19604's provisions requiring that Churchill Downs Technology choose between a lower hub fee rate as proposed by TOC, abandoning its hub agreement with Santa Anita Park, or proceeding to arbitration, are invalid and unenforceable because they do not comport with the constitutional protections afforded under the United States Constitution and the California Constitution.

60.    The provisions, as written, threaten to severely impair Churchill Downs Technology's carefully negotiated Hub Agreement with Santa Anita Park.

61.    The provisions allow a third-party, non-signatory to the Hub Agreement, to deprive Churchill Downs Technology of its contracted-for hub fee.

62.    Moreover, the arbitration provisions provide no guidance to the arbitrator on how she or he is to resolve the dispute between the parties and reach a fair, impartial, and equitable solution.  As such, any decision the arbitrator reaches would necessarily be arbitrary.

63.    The arbitration provisions also lay out an inherently unfair procedural mechanism that restricts Churchill Downs Technology to fewer than 60 days to

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Gibson, Dunn & Crutcher LLP

1  prepare its defense, with no guidelines to indicate what documents, evidence, or

2  testimony to present.

3      64.    Churchill Downs Technology never consented to this statutory scheme; it

4  has been unilaterally imposed by statute without any opportunity for Churchill Downs

5  Technology to protect its constitutional rights and ensure a fair process, rendering the

6  scheme unconscionable.

7      65.    Finally, in the event that an arbitrator reaches a decision over the hub fee

8  dispute, Churchill Downs Technology risks being forced to abide by the arbitrator's

9  unconstitutional award without any means for meaningful judicial review.

10  ## COUNT II

11  **Declaratory Relief: Violation of the U.S. Constitution's Due Process Clause**

12      66.    Plaintiffs incorporate here by reference paragraphs 1 through 65, as if

13  fully set forth herein.

14      67.    Section 19604 violates Churchill Down's rights founded in the Due

15  Process Clause of Section 1 of the Fourteenth Amendment to the United States

16  Constitution.

17      68.    Section 19604's provisions requiring that Churchill Downs Technology

18  choose between a lower hub fee rate as proposed by TOC, abandoning its hub

19  agreement with Santa Anita Park, or proceeding to arbitration, are invalid and

20  unenforceable because they do not comport with the constitutional protections afforded

21  under the Due Process Clause of the United States Constitution.

22      69.    The provisions, as written, threaten to severely impair Churchill Downs

23  Technology's carefully negotiated Hub Agreement with Santa Anita Park. The

24  provisions allow a third-party, non-signatory to the Hub Agreement, to deprive

25  Churchill Downs Technology of its contracted-for hub fee.

26      70.    Moreover, the arbitration provisions allow a non-party to force one of the

27  parties to a valid contract into a rushed 60-day arbitration process, thereby depriving

28

the defendant of meaningful time to collect evidence; identify, hire, and prepare expert testimony; conduct proper discovery; and otherwise build a proper defense.

71.     Section 19604's arbitration provisions also empower the arbitrator to render a final and binding decision upon the parties without providing any kind of process for meaningful judicial review of the award.

72.     Further, the arbitration provisions deprive the parties of the right to challenge an arbitration award that may be unlawful or not based on substantial evidence. They also provide no mechanism for judicial review or even to bring a motion to vacate an arbitration award based on fraud, deception, bias, or deceit.

73.     As such, Section 19604 provides no judicial mechanisms to ensure the arbitration provisions have been carried out fairly, and Churchill Downs Technology will be deprived of its due process rights if forced to arbitrate the terms of its Hub Agreement.

74.     Additionally, Section 19604 provides no standards whatsoever from which an arbitrator is to decide between the contractually-agreed upon hub fee and the alternate fee proposed by TOC. Section 19604 does not provide any factors at all for the arbitrator to consider when making its decision.

75.     Nor does Section 19604 give Churchill Downs Technology any indication as to what evidence it should rely on to mount in its defense.

76.     As such, Section 19604 fails to provide any standard for how the arbitrator will decide the dispute and will necessarily result in arbitrary decision-making.

77.     For these additional reasons, Section 19604's arbitration provisions deprive Churchill Downs Technology of its due process rights.

## COUNT III

**Declaratory Relief: Violation of the California Constitution's Due Process Clause**

78.     Plaintiffs incorporate here by reference paragraphs 1 through 77, as if fully set forth herein.

79.     For the same reasons set forth in Count II, the arbitration provisions of Section 19604 violate the Due Process Clause of Article I, Section 7 of the California Constitution.

## COUNT IV

**Declaratory Relief: Violation of the U.S. Constitution's Contracts Clause**

80.     Plaintiffs incorporate here by reference paragraphs 1 through 79, as if fully set forth herein.

81.     Churchill Downs Technology is party to a valid contract with Santa Anita Park. This contract establishes that as consideration for Churchill Downs Technology's services as an ADW provider, Churchill Downs Technology will receive compensation in the form of a hub fee for wagers placed by California residents on out-of-state races through its platforms TwinSpires.com and BetAmerica.

82.     If Section 19604 were enforced consistent with defendant's intent, Churchill Downs Technology would be deprived of the benefit of its bargain under its contract with Santa Anita Park.

83.     The hub fee rate is the central term of Churchill Downs Technology's agreement with Santa Anita Park.

84.     Yet, Section 19604 allows a *stranger to the contract* to use its provisions to disrupt and deprive Churchill Downs Technology of the benefit of its bargain under its contract with Santa Anita Park. Again, the statute allows a third party to force the two contracting parties into three untenable options: accept the lower rate proposed by a stranger to the contract, abandon its hub agreement based on the demand of a stranger to the contract, or proceed to binding arbitration with a stranger to the contract.

85.     Section 19604's arbitration provision also prevents the parties from safeguarding or restraining the rights held in the existing contract with Santa Anita Park, and imposes on the parties a binding proceeding, without judicial review, and without providing any standard to govern the proceedings.

Gibson, Dunn & Crutcher LLP

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

86.   Section 19604's arbitration provisions serve no legitimate public purpose.

87.   Even if the arbitration provisions served a legitimate public purpose, which they do not, they impose unreasonable conditions to adjust Churchill Downs Technology's and Santa Anita Park's rights and responsibilities.  Furthermore, these unreasonable conditions are not of a character appropriate to any public purpose that might have justified the legislation's adoption.

88.   Section 19604 therefore violates the Contracts Clause of the United States Constitution.

## COUNT V

## Declaratory Relief: Violation of the California Constitution's Contracts Clause

89.   Plaintiffs incorporate here by reference paragraphs 1 through 88, as if fully set forth herein.

90.   For the same reasons as described in Count IV, the arbitration provisions of Section 19604 violate Article I, Section 9 of the California Constitution, which provides that "law impairing the obligation of contracts may not be passed."

## PRAYER FOR RELIEF

Churchill Downs Technology asks this Court to order appropriate relief, including, but not limited to, the following:

a. enter declaratory judgment stating that TOC's invocation of California Business and Professions Code section 19604 is invalid and unenforceable against Churchill Downs Technology, including the provisions requiring that Churchill Downs Technology accept a lower hub fee rate as proposed by TOC, abandon its hub agreement with Santa Anita Park, or proceed to arbitration;

b. enter an injunction prohibiting TOC from utilizing California Business and Professions Code section 19604 provisions against Churchill Downs to force it to accept a lower hub fee rate as proposed by TOC, abandon its hub agreement with Santa Anita Park, and/or proceed to arbitration;

c. enter a declaratory judgment stating that, facially and as applied in this case, the provisions in California Business and Professions Code section 19604 requiring that Churchill Downs Technology accept a lower hub fee rate as proposed by TOC, abandon its hub agreement with Santa Anita Park, or proceed to binding arbitration violate the Due Process Clause of the Fourteenth Amendment;

d. enter a declaratory judgment stating that, facially and as applied in this case, the provisions in California Business and Professions Code section 19604 requiring that Churchill Downs Technology accept a lower hub fee rate as proposed by TOC, abandon its hub agreement with Santa Anita Park, or proceed to binding arbitration violate the Due Process Clause of Article I, Section 7 of the California Constitution;

e. enter a declaratory judgment stating that, facially and as applied in this case, the provisions in California Business and Professions Code section 19604 requiring that Churchill Downs Technology accept a lower hub fee rate as proposed by TOC, abandon its hub agreement with Santa Anita Park, or proceed to binding arbitration violate the Contracts Clause of Article 1, Section 10 of the United States Constitution;

f. enter a declaratory judgment stating that, facially and as applied in this case, the provisions in California Business and Professions Code section 19604 requiring that Churchill Downs Technology accept a lower hub fee rate as proposed by TOC, abandon its hub agreement with Santa Anita Park, or proceed to binding arbitration violate the Contracts Clause of Article I, Section 9 of the California Constitution; and

g. grant Churchill Downs Technology such additional or different relief as the Court deems just and proper.

Dated: February 2, 2021

By: /s/ Scott A. Edelman
Scott A. Edelman

Attorney for Plaintiff

Gibson, Dunn & Crutcher LLP